UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BOBBY EMMITT KENNEDY,

          Petitioner,

v.                                     CASE NO. 2:10-cv-11666
                                     HONORABLE GEORGE CARAM STEEH

DARRELL STEWART,

          Respondent.
_____/

**OPINION AND ORDER
DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS
BUT GRANTING IN PART A CERTIFICATE OF APPEALABILITY**

      Petitioner Bobby Emmitt Kennedy has filed an application for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. The habeas petition challenges petitioner's state convictions for first-degree murder, felon in possession of a firearm, and possession of a firearm during the commission of a felony (felony firearm). Petitioner alleges that he was denied his constitutional right to counsel of choice and deprived of his right to present a defense. Respondent Darrell Stewart urges the Court to deny the petition on the basis that the state appellate court's adjudication of petitioner's claims was objectively reasonable. The Court agrees with respondent. Accordingly, the habeas petition will be denied.

**I. BACKGROUND**

      In 2003, petitioner was charged in Kent County, Michigan with open murder, felon in possession of a firearm, and felony firearm. The charges arose from the fatal

shooting of nineteen-year-old Timothy Thomas in Grand Rapids, Michigan on June 24, 1997. Petitioner was tried before a jury in Kent County Circuit Court where

> [t]he prosecution['s] theory of the case was that Bobby Kennedy shot Thomas execution-style because Bobby Kennedy believed that Thomas had stolen some drugs from him and because Thomas had subsequently threatened Bobby Kennedy in front of other people. Several witnesses testified that Bobby Kennedy told people before the shooting that he was going to kill Thomas and that, after the shooting, he bragged that he had done it. According to the prosecution, Bobby Kennedy established a false alibi after the murder with the help of several witnesses. The witnesses testified that they lied by telling police that Bobby Kennedy was with them on the morning of the murder. The prosecutor also contended that Bobby Kennedy paid for lawyers for the witnesses when they got in trouble during the years between the time of the shooting and the time that the grand jury indicted Bobby Kennedy. The prosecutor posited that Bobby Kennedy used the lawyers he paid for to keep the witnesses quiet and monitor what they said to police.
>
> Anthony McLiechey testified that on the morning of June 24, 1997, he drove Bobby Kennedy to the location where the shooting took place, that he saw Bobby Kennedy shoot Thomas, and that he disposed of the gun in a garbage can after the shooting. After the murder, McLiechey drove Bobby Kennedy to Tanea McKinney's apartment. Tanea McKinney testified that Bobby Kennedy and McLiechey came to her apartment sometime around 6:00 or 6:30 a.m. on the morning of June 24, 1997. Tanea McKinney stated that she overheard Bobby Kennedy tell her boyfriend, John Holman, "I got him." Bobby Kennedy then changed his clothes, and Tanea McKinney helped him put his old clothes in a bag to take out to the trash. McLiechey, Bobby Kennedy, Tanea McKinney, and Holman, then all went to breakfast.
>
> When police questioned Tanea McKinney a couple days after the murder, she told them that Bobby Kennedy came to her house at 3:00 a.m. on the morning of June 24, 1997, and was there until they went to breakfast. But during the 2003 grand jury hearing, Tanea McKinney confessed to lying about Bobby Kennedy's whereabouts on the morning of the murder. She explained that she eventually decided to tell the truth during the grand jury proceedings because she did not want to be subject to more jail time for lying.[1]

---

[1] Tanea McKinney was serving a 20-to-50-year sentence on a drug possession conviction.

> During his 2003 grand jury testimony, McLiechey repeatedly denied knowing anything about the murder. But McLiechey was later recalled during the grand jury hearing, and he finally admitted that he was involved in the murder as the driver of the vehicle that carried Bobby Kennedy to and from the scene of the shooting. At that time, McLiechey denied that Bobby Kennedy ever threatened him or tried to pay him off. At trial in 2005, McLiechey explained that he eventually decided to tell the truth during the grand jury proceedings because Tanea McKinney had finally confessed to lying to the police. McLiechey testified that Bobby Kennedy began threatening him after he testified before the grand jury.

People v. Kennedy, No. 271020, 2007 WL 3309995, at *1-2 (Mich. Ct. App. Nov. 8, 2007) (unpublished) (footnote in original as note 5).

Petitioner's defense was that the prosecution had failed to prove its case beyond a reasonable doubt, in part, because there was no physical evidence linking him to the crime. Although he did not testify, he presented several witnesses who testified, among other things, that he and Timothy Thomas had resolved their dispute, that Timothy Thomas had pulled a gun on someone else, that he (petitioner) was not inclined to carry a weapon, and that someone else in the community was known by the same nickname of "Sleepy." Defense counsel argued to the jury that the police investigation was incomplete, that there was no clear, single motive for the crime, and that the witnesses who implicated petitioner were not credible because they had self-serving reasons for testifying as they did.

On June 20, 2005, the jury found petitioner guilty of first-degree (premeditated) murder, Mich. Comp. Laws § 750.316(1)(a), felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and felony firearm, Mich. Comp. Laws § 750.227b. The trial court sentenced petitioner to two years in prison for the felony firearm conviction (with

610 days of jail credit), followed by concurrent terms of life imprisonment for the murder conviction and two to five years in prison for the felon-in-possession conviction.

In an appeal of right, petitioner argued that he was deprived of his constitutional right to due process by (1) the denial of his right to counsel of choice, (2) the prosecutor's obsession with the fact that petitioner hired an attorney for a defense witness, (3) the admission of evidence of prior, uncharged crimes, and (4) the exclusion of critical evidence. The Michigan Court of Appeals rejected these claims and affirmed petitioner's convictions in an unpublished, *per curiam* opinion. See Kennedy, 2007 WL 3309995. Petitioner raised the same claims and three new claims in the Michigan Supreme Court, which denied leave to appeal on January 27, 2009, because it was not persuaded to review the issues. See People v. Kennedy, 483 Mich. 880 (2009).

Petitioner filed his habeas corpus petition through counsel on April 23, 2010. He claims that: (1) his conviction and sentence must be set aside because he was unreasonably denied his right to representation by counsel of his choice; and (2) his rights to due process and to present a defense were denied by the trial court's exclusion of critical evidence.

## II.  STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." Harrington v. Richter, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, state prisoners are not entitled to the writ of habeas corpus unless the state court's adjudication of their claims on the merits

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S. Ct. at 786 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

### III. DISCUSSION

### A. Counsel of Choice

Petitioner alleges that he was denied his right to due process and his right to counsel of choice when the trial court granted the prosecutor's motion to disqualify

petitioner's retained attorney, N.C. Deday LaRene.[2] The prosecutor contemplated calling Mr. LaRene as a witness to demonstrate that petitioner was manipulating people and trying to silence potential witnesses against him by hiring attorneys for the witnesses when they had legal problems or were under investigation for Timothy Thomas's murder.

### 1. Clearly Established Federal Law

A defendant in a criminal case has a constitutional right to the assistance of counsel in his defense. U.S. CONST. amend. VI; Faretta v. California, 422 U.S. 806, 807 (1975). "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006). "A choice-of-counsel violation occurs whenever the defendant's choice is wrongfully denied." Id. at 150 (emphasis in original).

> Where the right to be assisted by counsel of one's choice is wrongly denied, therefore, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation. Deprivation of the right is "complete" when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received.

Id. at 148. The erroneous deprivation of the right to counsel of choice is a structural error, which is not subject to harmless-error analysis. Id. at 150.

The right to counsel of choice is not absolute, however. See Wheat v. United States, 486 U.S. 153, 159 (1988) (explaining that, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal

---

[2] Mr. LaRene is currently representing petitioner in this habeas case.

defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers"); see also United States v. Swafford, 512 F.3d 833, 839 (6th Cir. 2008) (describing the right to counsel of choice as "a qualified right"). The right "is circumscribed in several important respects." Wheat, 486 U.S. at 159. A trial court has "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Id. at 160. Consequently, a trial court has "wide latitude in balancing the right to counsel against the needs of fairness." Gonzalez-Lopez, 548 U.S. at 152. A trial court's determinations and decision on the issue "will be upheld unless 'arbitrary' or 'without adequate reasons.'" Swafford, 512 F.3d at 839 (quoting United States v. Mays, 69 F.3d 116, 121 (6th Cir.1995)).

Further, under both the American Bar Association's Model Rules of Professional Conduct and the Michigan Rules of Professional Conduct, a lawyer may not act as an advocate at a trial in which the lawyer is likely to be a necessary witness except when

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

Model Rules of Professional Conduct 3.7(a); Mich. Rule of Professional Conduct 3.7(a).

**2. Analysis**

### a. The Trial Court Proceedings

At a pretrial hearing on the prosecutor's motion to disqualify Mr. LaRene as defense counsel, the prosecutor claimed to have evidence of three prior occasions,

including one involving Mr. LaRene, when petitioner hired attorneys either to facilitate communication between a witness and himself or to help the witness with an investigative subpoena concerning Timothy Thomas's murder. The prosecutor stated that, although she had no way of knowing at the pretrial stage whether the anticipated testimony would be contested, there certainly was a possibility that it would be contested. The prosecutor sought to question Mr. LaRene regarding things that were not privileged information, such as the arrangements that were made to hire attorneys, who made them, the compensation that was provided, and the form of the payment. (Tr. Hr'g on Mot. to Disqualify Defense Counsel, 13-17, Oct. 22, 2004.)

Mr. LaRene argued at the hearing that the matter was not contested because, during a grand jury proceeding, attorney Louise Herrick had testified about her representation of eyewitness Anthony McLiechey when McLiechey was subject to an investigative subpoena. Mr. LaRene was satisfied that Ms. Herrick had testified accurately and truthfully about his involvement in the procurement of counsel for Mr. McLiechey. (Id. at 12, 27.)

The trial court also was not persuaded that the issue was contested. Accordingly, the court denied the prosecutor's motion without prejudice. (Id. at 27.)

The prosecutor renewed her motion to disqualify Mr. LaRene after serving Mr. LaRene with written interrogatories and after acquiring information that petitioner was conspiring with other inmates to influence and intimidate Anthony McLiechey. The prosecutor stated at the hearing on her renewed motion that Mr. LaRene was not willing to stipulate to evidence and that he had not cooperated when she presented him with the written interrogatories. The prosecutor claimed that Mr. LaRene had declined to

answer certain basic questions about how long he had known the defendant and whether he was related to him or had received any benefits from him. Instead, according to the prosecutor, Mr. LaRene had merely referred to Louise Herrick's grand jury testimony about Anthony McLiechey instead of answering the questions from personal knowledge. As for questions about other witnesses, the prosecutor claimed that Mr. LaRene had merely answered that he did not know the answer to the questions or could not recall what happened. The prosecutor maintained that she could not determine the extent of Mr. LaRene's involvement with prosecution witnesses, nor how much influence petitioner had in manipulating Mr. LaRene or using him to influence prosecution witnesses. (Tr. Hr'g on Mot. to Disqualify Defense Count, 7-11, Jan. 5, 2005.)

The prosecutor speculated that, if the jury heard evidence of petitioner's attempt to tamper with witnesses, the jury would assume that Mr. LaRene was either assisting petitioner in his scheme to silence witnesses or that petitioner was manipulating his own attorney. Either way, the prosecutor thought that the jury would conclude petitioner was guilty. The prosecutor concluded that there was a conflict of interest which could affect the fairness of the trial. (Id. at 15-16.)

Mr. LaRene argued that he had done nothing improper, that he was not a necessary witness, and that the issue was uncontested. He maintained that, if called as a witness, his testimony would be cumulative to Ms. Herrick's grand jury testimony about being contacted to represent a witness in the investigation. (Id. at 20-24.)

The prosecutor responded that she still did not know what Mr. LaRene knew about the issue and that there were some questions which only Mr. LaRene could

answer, such as why he paid Ms. Herrick a bonus of a thousand dollars for representing Anthony McLiechey, who was the prosecution's only known eyewitness. Mr. LaRene replied that he paid the money to Ms. Herrick for the trouble she experienced in representing McLiechey. Mr. LaRene maintained that the prosecutor was on a fishing expedition at the expense of petitioner's Sixth Amendment rights. (Id. at 24-30.)

The trial court opined that petitioner's use of Mr. LaRene to retain counsel for Anthony McLiechey appeared to be uncontested, but that credibility issues remained. The court concluded that the prosecutor was entitled to call Mr. LaRene as a witness in light of the allegations of witness tampering and the fact that Mr. LaRene appeared to be a little too involved in the case. And because the trial court did not think that the prosecutor was trying to have Mr. LaRene removed for improper reasons, the court granted the prosecutor's motion to disqualify Mr. LaRene as counsel for petitioner. (Id. at 30-37.)

### b. The State Appellate Court's Decision

The Michigan Court of Appeals upheld the trial court's decision and concluded that the trial court did not err in disqualifying LaRene from serving as defense counsel. The Court of Appeals stated that Mr. LaRene was "likely to be a necessary witness to show that [petitioner] used his money to control and influence Anthony McLiechey and other witnesses." Kennedy, 2007 WL 3309995, at *4. The Court of Appeals went on to say that "part of the prosecutor's case was that LaRene was a conduit for [petitioner's] control over key witnesses by the procurement and payment of legal services for that witness" and that Mr. LaRene "was involved in recruiting counsel to represent potential witnesses in [petitioner's] trial." Id. The Court of Appeals concluded that Mr. LaRene's

"involvement made him a potentially necessary witness to [petitioner's] overall scheme to manipulate or silence witnesses, and created a conflict of interest that precluded [him] from representing [petitioner]." Id.

Petitioner claims that the Court of Appeals overstated the proofs, misstated the facts, and unreasonably concluded that Mr. LaRene's testimony would not pertain to uncontested matters. While it is true that Mr. LaRene did not contest the fact that he facilitated the hiring of Ms. Herrick to represent Anthony McLiechey and that he gave Ms. Herrick a thousand dollars for her trouble, the contested issue was whether petitioner had tried to manipulate people to prevent his prosecution for Timothy Thomas's murder. To resolve the issue, the prosecutor sought to determine Mr. LaRene's motive for becoming involved in the recruitment of counsel for Anthony McLiechey, who was a key witness in the case. Among other things, the prosecutor wanted to know Mr. LaRene's reason for giving Ms. Herrick a thousand-dollar cash bonus after Herrick was paid $1,500 by someone else to represent McLiechey concerning the investigative subpoena.

As the trial court recognized, retaining an attorney for McLiechey could have been a legitimate and an appropriate thing to do. On the other hand, it could have been, as the prosecution suggested, an attempt to protect petitioner from prosecution and to silence the only eyewitness to the crime. The Michigan Court of Appeals noted that

> [i]nformation regarding the fee and referral arrangement for the hiring of an attorney for a witness, when and how the referral attorney was contacted, as well as who sought the arrangement was not available by any other means than LaRene. Although Herrick and [attorney Glenda] Allen were available to testify regarding the referral and the payment of

> the fees at their end of the arrangements, only LaRene could testify regarding the transactions from his perspective, which the testimony revealed may have differed from Herrick's and Allen's recollections. LaRene's testimony was likely to be a critical and integral part of the case necessary to illuminate his relationship with Bobby Kennedy and the witnesses.

Kennedy, 2007 WL 3309995 at *4. The Court of Appeals reasonably concluded that Mr. LaRene was a potential and necessary witness to petitioner's scheme to intimidate and silence witnesses and that Mr. LaRene's testimony would have created a conflict between his role as witness and his role as advocate for petitioner.

The fact that the prosecutor never called Mr. LaRene as a witness at trial is not problematic, because the trial court had to assess the situation "not with the wisdom of hindsight after the trial [took] place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." Wheat, 486 U.S. at 162-63. Trial "courts have the ability to prevent a conflict . . . where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.'" Swafford, 512 F.3d at 839 (quoting Wheat, 486 U.S. at 163).

In conclusion, the state appellate court's determination of the facts and conclusion that Mr. LaRene was disqualified from serving as defense counsel were reasonable. The Court of Appeals balanced the petitioner's right to counsel of choice with the public's interest in the efficient and fair administration of justice, the avoidance of conflicts of interest, and the adherence to ethical standards. Furthermore,

> [s]tate court decisions are to "be given the benefit of the doubt" and the standard for evaluating decisions is "highly deferential." Cullen [v.

> Pinholster, __ U.S. __, __, 131 S. Ct. 1388, 1398 (2011)] (citing Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 154 L. Ed.2d 279 (2002)). There must be "no reasonable basis for the state court to deny relief" before a petition is granted. Harrington [v. Richter], 131 S. Ct. at 784. And "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 786 (citation omitted).

Bell v. Howes, __ F.3d __, __, No. 11-1046, 2012 WL 6600364, at *5 (6th Cir. Dec. 19, 2012).

The state appellate court's decision in this case was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87. Consequently, petitioner has no right to habeas relief on the basis of his first claim.

**B. The Right to Present a Defense**

Petitioner's second and final claim alleges that the trial court deprived him of his right to due process and his right to present a defense by excluding critical evidence. The disputed evidence consisted of a police officer's investigative report from an interview with Johnny Brown, who apparently witnessed the crime on his way home from work as a security officer. Because Mr. Brown died before petitioner's trial, he was unable to testify about what he observed.

Petitioner contends that Mr. Brown was a disinterested witness whose description of the crime was inconsistent with the version of the facts provided by prosecution witnesses. Because of this inconsistency, petitioner contends that notes regarding Mr. Brown's interview were crucial to his defense that prosecution witnesses were fabricating their version of the facts to protect their own self interests.

**1. The State Court Rulings**

Petitioner raised this issue through counsel during trial. Defense counsel maintained that the police officer's report was critical to the defense because Mr. Brown was an eyewitness to the crime. According to defense counsel, Mr. Brown's version of the facts was consistent with the testimony of certain neighborhood people who testified that they did not see anyone exit the car, but it was inconsistent with testimony given by prosecution witnesses who claimed that the shooter got out of the car. Defense counsel claimed that Mr. Brown was interviewed by a trained detective on the day of the murder and that he appeared to have an honest recollection of the car involved in the crime, the people in the car, and the gunshots. Defense counsel concluded that the officer's report of the interview with Mr. Brown was trustworthy and, therefore, admissible under the Michigan Rules of Evidence. He also pointed out that the officer's report was preserved as part of the case file. (Trial Tr. vol. XIII, 143-47, June 16, 2005.)

The prosecutor countered that the investigative report was not reliable because Mr. Brown's description of the car in question and its location were completely inconsistent with the account given by other witnesses, including the prosecution's only eyewitness. (Id. at 153-57.) The trial court sided with the prosecutor and ruled that defense counsel could not admit the investigative report because the report did not contain equivalent circumstantial guarantees of trustworthiness under Michigan Rule of Evidence 804.[3] The court noted that there was no opportunity for the prosecutor to

---

[3] Rule 804(b) lists certain exceptions to the hearsay rule which apply when the declarant is unavailable as a witness. Subsection (b)(7) provides that a statement not specifically covered by any of the other exceptions to the rule, but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule

cross-examine and confront Mr. Brown about the accuracy of his statement and that it was not uncommon for a police officer to write something that differed from what a witness actually said. The court stated that police reports typically are not admitted in evidence because of the hearsay nature of the reports and that Mr. Brown had merely made a general observation about the number of shots fired and the color of the car. (Trial Tr. vol. XIII, 147-53, 157-58, June 16, 2005.)

The Michigan Court of Appeals ruled that the trial court did not abuse its discretion in denying petitioner's motion to admit the investigative report. The Court of Appeals opined that the report was unverified and, therefore, was untrustworthy evidence from an unavailable witness. In reaching this decision, the Court of Appeals stated that

> an unspecified police officer's notes from an interview with Brown do not have the necessary guarantees of trustworthiness to be admissible at trial. Brown's statements were made several hours after the shooting incident took place, his recollection was inconsistent with that of other witnesses who were present to testify at trial, and the record was lacking evidence regarding Brown's reliability. There was no evidence regarding the accuracy of the police officer's notes, and as the trial court pointed out, "it's not uncommon for a police officer to write something down differently or incorrectly from what is stated."

Kennedy, 2007 WL 3309995, at *9.

---

> if the court determines that (A) the statement is offered as evidence of a material fact, (B) the statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts, and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence . . . .

Mich. R. Evid. 804(b)(7).

## 2. AEDPA and a State Court's Failure to Address a Constitutional Claim

Ordinarily, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review," Moreland v. Bradshaw, 699 F.3d 908, 923 (6th Cir. 2012), because "federal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780 (1990). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991). Petitioner, however, claims that the trial court's ruling violated his constitutional right to present a defense.

The Michigan Court of Appeals did not address the constitutional aspect of petitioner's claim, but the Supreme Court's decisions in Richter and Early v. Packer, 537 U.S. 3 (2002) (per curiam), "appear to require AEDPA deference where a federal issue has been raised but the state court has denied the claim with a discussion solely of state law." Moreland, 699 F.3d at 922 (citing Childers v. Floyd, 642 F.3d 953, 968-69 (11th Cir. 2011)). Although "[t]he Supreme Court has recently granted certiorari in a case that may definitively resolve this issue," this Court is not required to "anticipate the Supreme Court's ultimate ruling on the issue." Id. (citing Cavazos v. Williams, __ U.S. __, 132 S. Ct. 1088 (2012)). As the following discussion demonstrates, "even free of AEDPA deference, [petitioner] has not established due process violations." Id.

## 3. Analysis

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). Nevertheless, "[a] defendant's right

-16-

to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." United States v. Scheffer, 523 U.S. 303, 308 (1998).

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. . . . [T]he Constitution permits judges to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.

Holmes v. South Carolina, 547 U.S. 319, 326-27 (2006) (quotation marks and citations omitted) (end bracket in original).

As noted, the disputed evidence in this case consisted of a detective's report of an interview with Mr. Brown, a forty-seven-year old security officer that witnessed the murder, but died before petitioner's trial. There is no indication in the record that Mr. Brown was able to identify the shooter. Instead, he apparently provided information about the car used by the shooter and the number of gunshots fired at the victim. The number of gunshots was established through other witnesses, and the car used in the shooting did not belong to petitioner. It was a rental car, which Anthony McLiechey had acquired from someone on the street. Thus, the excluded report concerning Mr. Brown's observations about the car and number of gunshots was "only marginally relevant." Holmes, 547 U.S. at 326. The probative value of the report was outweighed by the possibility that the jury would be misled by the report due to the prosecutor's inability to question Mr. Brown about his observations. The Court therefore concludes that petitioner's right to present a meaningful defense was not violated by the exclusion of the investigative report on the interview with Johnny Brown.

**4. Harmless Error Analysis**

Even if the trial court erred by denying petitioner's request to admit the investigative report, the right to present a defense is subject to harmless-error analysis. See Fleming v. Metrish, 556 F.3d 520, 536-37 (6th Cir. 2009). On federal habeas corpus review, a constitutional error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). This standard applies whether or not the state court recognized the error and reviewed it for harmlessness. Fry v. Pliler, 551 U.S. 112, 121-22 (2007).

The alleged error in this case was harmless in light of the overwhelming evidence against petitioner. Several witnesses implicated petitioner in the crime. Four of those witnesses (John McKinney, Brandon Robinson, Danny White, and Levar Elliott) testified that petitioner admitted to them that he murdered the victim. Anthony McLiechey, moreover, testified that he was the driver of the car used in the crime and that he saw petitioner shoot the victim. And a state employee testified that, during an appointment she had with petitioner, petitioner stated that his "contact" had informed him that he beat the indictment on the murder charge.

Although several prosecution witnesses admittedly gave prior inconsistent statements to the police, some of them claimed that they got nothing in return for their testimony at petitioner's trial. The scientific and medical evidence, moreover, supported their testimony. The medical examiner testified that the victim had five gunshot wounds, including one on his leg and two on his head. There was additional evidence that all the casings at the crime scene were fired by the same gun and that the casings

consisted of two groups: four casings were found in the street, and two were found in the grass near the sidewalk. This evidence was consistent with petitioner's admissions to witnesses that he shot the victim on his body and subsequently in the head after the victim moved.

The investigative report regarding Johnny Brown did little to undermine the credibility of the prosecution witnesses' account of the crime. The Court therefore concludes that, even if the exclusion of the investigative report about Johnny Brown amounted to constitutional error, the error could not have had a substantial and injurious effect or influence on the jury and was harmless.

### IV. CONCLUSION AND CERTIFICATE OF APPEALABILITY

The state appellate court's denial of petitioner's claims was not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. Further, the state appellate court's decision was not "so lacking in justification" that it resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87. Accordingly, the petition for a writ of habeas corpus [Dkt. #1] is **DENIED**.

The Court nevertheless **GRANTS** a certificate of appealability on petitioner's claim that he was denied his right to counsel of choice (claim one), because that claim deserves encouragement to proceed further and reasonable jurists could debate whether the issue should have been resolved differently. Slack v. McDaniel, 529 U.S. 473, 484 (2000). The Court declines to grant a certificate of appealability on petitioner's evidentiary claim (claim two) because reasonable jurists would not find the Court's

assessment of that claim debatable or wrong, nor conclude that the issue deserves encouragement to proceed further. Id.

Dated: January 9, 2013

                         s/George Caram Steeh  
                         GEORGE CARAM STEEH  
                         UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on January 9, 2013, by electronic and/or ordinary mail.

s/Marcia Beauchemin  
Deputy Clerk

---